MICHAEL E. KIRBY, Judge.
| STATEMENT OF CASE
The State charged Wayland K. Harve-ston with two counts of resisting a police officer with force or violence. Harveston pled not guilty at his arraignment; following a bench trial, the court found him guilty as charged on both counts and sentenced him to serve eighteen months at hard labor. The court denied his motion to reconsider the sentence.

STATEMENT OF FACT

Officer Mark Vasquez testified that on the evening of December 16, 2009, he and Officer Payne responded to a call of suspicious people carrying knives in Wolden-berg Park.[1] Both officers were dressed in full police uniforms and Woldenberg Park was closed when they responded. Off. *955 Vasquez testified that when they approached the park area, they saw roughly fifteen people with “dagger like objects ... participating in some kind of pagan wedding ritual” on a musical stage in the park. They ordered everyone to drop their knives, large sticks, and ^anything else that could have been used as a weapon, and then escorted those who appeared to be intoxicated, consuming alcohol, or in possession of objects that looked like weapons, to Toulouse St. for interviews. Off. Vasquez estimated that they escorted four or five people, including the defendant, to Toulouse St. where their car was parked. Harveston was intoxicated and holding an open container of alcohol. All of the individuals, including Harveston, were advised of their Miranda rights prior to being escorted to the car.
When Offs. Vasquez and Payne relocated the subjects to Toulouse St., Offs. Crowley and Fuqua arrived on the scene. After the subjects were relocated, the officers began doing background checks on them. Off. Vasquez was at the front of the car, while Off. Payne sat in the front seat and entered the names into the computer. Harveston was sitting on the street curb, roughly two or three feet away from the officers. Off. Vasquez testified that it was difficult to ascertain Harveston’s true identify because he gave the officers three different names and birthdates, and was not carrying any identification.
The first subjects’ names came back clear, and the officers released them. Harveston’s name was the last one the officers attempted to search. Because Harveston had given the officers three different names and birthdates, they knew he was not being truthful with them. They planned on arresting him for trespassing in the park and for public intoxication, and asked him to stand up. Harveston stood up and screamed: “I’m not going back to OPP.” When Harveston started screaming, Off. Payne stepped out of the police car and approached the other officers. Harveston started running, and as he was running, he swung at Off. Payne, hitting her on the shoulder or chin. Next, Harve-ston elbowed Off. Crowley. The officers pursued him and were able to detain him several feet away. Off. |sFuqua tasered Harveston to get him to stop resisting. Once Harveston stopped resisting, they placed him in handcuffs and ordered an EMS unit to check out his injuries.[2] Off. Vasquez learned Harveston’s true identity when he arrived at the hospital, and this led to the discovery that Harveston had an outstanding warrant for a probation violation.
On cross examination, Off. Vasquez testified that all fifteen people were trespassing at Woldenberg Park, but none were cited for trespassing. Upon his arrival at the park Off. Vasquez saw two individuals, one of whom was holding a knife, tied to each other with rope, but did not see anyone who appeared to be injured. He further testified that when he arrived at the park, Harveston was holding a large stick.
Off. Vasquez testified that of the people escorted to Toulouse St., two different members had pending arrest warrants, and one had four municipal attachments. When the members were initially escorted to Toulouse St., Off. Vasquez did not know that Harveston had outstanding arrest warrants. Harveston was being escorted to Toulouse St. for trespassing and public intoxication. The officers attempted to arrest him after he gave them two incorrect names, both of which were researched and came back as “not on file,” as his name.
*956 Off. Jennifer Samuels Payne testified that she was working with Off. Vasquez when a call came out that several white males and white females with knives were situated around the stage area at the riverfront. Offs. Payne and Vasquez took the call and headed over to the riverfront. As they approached the stage area, they witnessed several white males and females engaging in “some kind of ritual.” They were wearing cloaks, and some carried sticks and daggers. Two ^people were tied together with either rope or animal hair. Because she saw knives, Off. Payne drew her gun and told everyone to put their hands up and drop their knives, which they did. The officers ordered everyone away from the stage area so that they could pick up the knives. An Audubon Institute security guard helped the officers retrieve the weapons which were very realistic looking. Off. Payne asked the security guard to stay with Off. Vasquez so that she could start the process of running the names of the individuals in the computer of the police car.
Off. Payne relocated to the police car; none of the subjects came with her. A few minutes after reaching the car, she radioed Off. Vasquez that searching all the subjects’ names by radio communication was too difficult, and she asked him to bring the subjects over to the police car. All of the subjects were taken to the police car, stood on the sidewalk, and one by one were asked to walk up to the police unit to give her their name. Harveston was the third person to come to the unit. Off. Payne noticed that the name Harveston gave her was different than that written on Off. Vasquez’ paper identifying him. Off. Payne asked Harveston to take a seat until he could remember his name. Harveston complied and Off. Payne ran two or three more subjects before asking Harveston to come up again to give his name. Harveston walked back to the vehicle and again gave Off. Payne a false name. At that point, Off. Payne asked Off. Vasquez to handcuff the defendant. Right then, Harveston “started throwing punches saying he’s not going back to jail.” Off. Payne exited the vehicle and was approaching Harveston when he struck her in the shoulder/neck area. Harveston was fighting fiercely with all of the officers at the scene (Offs. Payne, Vasquez, Fuqua, and Crowley). Off. Payne pulled out her ASP and gave him a few blows to his upper thigh whereupon Harveston flipped her over his shoulder, causing her to fall and injure her hand. | ¿After Off. Payne hit the ground, she saw Harveston begin to run. Two officers were trying to control him, when Off. Payne heard Off. Fu-qua tell the others to clear so that he could tase Harveston. After Harveston was detained, he was handcuffed. Off. Payne’s hand was swelling and in great pain, so after Harveston was detained, Off. Vasquez took her to the hospital.
On cross examination, Off. Payne testified that when the subjects were taken from the stage area to Toulouse St., they were not free to leave the area.
Off. Patrick Crowley testified that on the evening of December 16, 2009, he approached the scene at Toulouse and the river, where the officers were running the names of the subjects, dressed in his police uniform. He went there to assist the other officers because of the safety issue presented by fifteen subjects with only three officers. Off. Crowley did not conduct any interviews.
Off. Crowley witnessed Off. Payne sitting in the police vehicle running the names of the subjects. Off. Vasquez was standing outside of the vehicle and asked Harveston to stand up so that he could put him in handcuffs. Off. Crowley began to approach Harveston, when Harveston screamed that he was not going back to OPP. Off. Crowley testified that Off. *957 Payne got out of the vehicle to assist Off. Vasquez in handcuffing the subject, and Harveston then hit Off. Payne. After Harveston hit Off. Payne, he came back with his elbow and struck Off. Crowley. Offs. Crowley, Payne, and Vasquez began struggling with Harveston to get his hands behind his back, when Off. Fuqua pulled out his taser, told the other officers to step aside, and he tased Harveston. Off. Crowley’s hand was injured during the struggle with Harveston.
On cross examination, Off. Crowley testified that there were about eight to ten subjects standing in a group. He remembered originally hearing that fifteen 1 (^subjects were at the scene when he first heard the radio call, but by the time he got there, there were only eight to ten people there.
Mr. Garrit Shafer testified that he has been friends with Harveston for ten years. Mr. Shafer was with Harveston on the evening of December 16, 2009, when they were witnessing a wedding ritual at Wol-denberg Park. The ritual involved a couple getting married by having their hands tied together while a priest used a dagger to perform the ceremony. The ceremony had just concluded when the officers arrived at the area. The officers seemed calm, asked “polite” questions, and ordered everyone to drop their knives. Mr. Shafer did not witness the struggle between Harveston and the officers.

ERRORS PATENT

The record reveals no patent errors.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1

In his sole assignment of error, defendant contends that the arresting police officers had no probable cause to arrest him for trespassing, public intoxication, or possession of an open container, and therefore, he had the right to resist the officers’ attempts to arrest him.
Defendant’s argument is incorrect.
Although Off. Vasquez testified he was attempting to arrest the defendant for trespassing, public intoxication, and possessing an open container, Off. Payne testified that she ordered Off. Vasquez to arrest him for intentionally providing her | ywith false identification. Offs. Vasquez and Payne both testified that the defendant provided them with false names three different times.
La. C. Cr. P. art. 215.1(A) codifies the U.S. Supreme Court’s authorization of stops based on reasonable suspicion set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and provides:
A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
“Reasonable suspicion” to stop is something less than probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether a detaining officer had sufficient facts within his or her knowledge to justify an infringement of the suspect’s rights. State v. Jones, 99-0861, p. 10 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 36-37.
Both officers testified that they received a call about several people in Woldenberg Park with knives. When they arrived they saw fifteen people, some with knives, daggers, and large sticks, and two were tied together. Considering these facts and circumstances, the officers had reasonable suspicion to stop the fifteen subjects, including Harveston, to order them to drop their weapons and determine who they were and what they were doing.
After stopping the people, the officers began to process each one. Rather than giving the officers his correct name, Harveston provided three different names *958 to the officers. Both officers testified that they believed Harveston was providing them with false names, as none of the names checked out in their computer. Off. Payne testified that the name Harveston gave to her was different than the name written down by Off. Vasquez. Off. Payne therefore asked Harveston to sit down 18to try to remember his proper name, and she continued processing other subjects. Off. Payne then asked Harveston whether he remembered his name, and he gave her a third name. At that point Off. Payne ordered Off. Vasquez to arrest Harveston.
Regardless of whether the officers had probable cause to arrest Harveston for trespassing, public intoxication, or possessing an open container, pursuant to La. R.S. 14:108(B)(l)(c), Harveston’s refusal to provide the officers with his proper name, was an arrestable offense.
La. R.S. 14:108 provides, in pertinent part:
A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.
B. (1) The phrase ‘obstruction of as used herein shall, in addition to its common meaning, signification, and connotation mean the following:
* * * ⅜ ⅜ ⅝
(c) Refusal by the arrested or detained party to give his name and make his identity known to the arresting or detaining officer or providing false information regarding the identity of such party to the officer. [Emphasis added]
La.C.Cr.P. art. 213 provides, in pertinent part:
A peace officer may, without a warrant, arrest a person when:
(1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or in close pursuit;
IsAt the time he proposes to effect an arrest, a police officer does not need to know that the particular crime has definitely been committed; it is sufficient under the totality of the known circumstances that it is reasonably probable that the crime has been committed. State v. Simms, 571 So.2d 145, 149 (La.1990). An arresting officer need only have a reasonable basis for believing that his information and conclusions are correct. State v. Pham, 2001-2199, p. 6 (La.App. 4 Cir. 1/22/03), 839 So.2d 214, 218.
Since providing a false name to an officer is a violation of La. R.S. 14:108, and Offs. Payne and Vasquez both testified that Harveston gave them three different names which they reasonably believed were false, the officers had probable cause to arrest Harveston for providing them a false name. Defendant’s reliance on State v. Hoye, 635 So.2d 1289, 1290 (La.App. 4 Cir. 4/14/94), is misguided. Hoye involved a previous version of La. R.S. 14:108, which made the crime of resisting an arrest only applicable to those situations where the defendant had lawfully been arrested, and not simply lawfully detained. La. R.S. 14:108 was amended by Acts 2006, No. 132, § 1, to provide that one can also resist a lawful detention by a police officer. Considering the statute has changed since Hoye was decided, and considering this Court’s ruling in Hoye regarding La. R.S. 14:108 would not be sound today due to these legislative changes, Hoye is wholly inapplicable to the subject matter.
This assignment has no merit.

*959
CONCLUSION

For the reasons expressed above we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Woldenberg Park is private property, owned by the Audubon Institute, and is situated along the Riverfront section of New Orleans.

. Off. Vasquez testified that Harveston fell and injured his head after the taser was deployed.